**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

IN RE: BABY FOOD PRODUCTS          MDL NO. _____
LIABILITY LITIGATION

_____/

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED
PRETRIAL PROCEEDINGS**

Pursuant to 28 U.S.C. § 1407 and Rule 6.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Movants[1] respectfully submit this Memorandum of Law in support of their Motion for Transfer of Actions for Coordinated Pretrial Proceedings of all currently filed personal injury Baby Food ("Baby Food") actions identified in the included Schedule of Actions, as well as any subsequently filed involving similar facts or claims arising from the development of brain injury which manifested as the neurodevelopmental disorders autism spectrum disorder ("ASD") or attention deficit hyperactivity disorder ("ADHD") following exposure to heavy metals in Baby Food products.

---

[1] Movants are Plaintiffs in the following cases: *D.M.P., a minor, et al. v Beech-Nut Nutrition Company, Inc., et al. (Case No. 2:23-cv-00344); A.A., a minor, et al. v. Hain Celestial Group, Inc., et al. (Case No. 3:23-cv-06087); M.H., a minor, et al. v. Hain Celestial Group, Inc., et al. (Case No. 8:23-cv-02203); D.S., a minor, et al. v. Hain Celestial Group, Inc., et al. (Case No. 2:23-cv-10193); V.Z., a minor, et al. v. Gerber Products Company (Case No. 4:23-cv-06324); A.T., a minor, et al. v. Gerber Products Company, et al. (Case No. 4:23-cv-06344); Clark, et al. v. Hain Celestial Group, Inc., et al. (Case No. 2:23-cv-02607); H.N., a minor, et al. v. Gerber Products Company, et al. (Case No. 4:23-cv-00942); Mosley, et al. v. Hain Celestial Group, Inc. (Case No. 3:23-cv-06176); and Maglinti, et al v. Beech-Nut Nutrition Company, Inc. et al.(Case No. 2:23-cv-02121).*

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................1

FACTUAL BACKGROUND.............................................................................................4

    I.    Exposure to Heavy Metal in Early Life Can Cause Brain Injury Which Presents as
ASD/ADHD ................................................................................................. 4

    II.   Congressional Investigation Finds Substantial Presence of Heavy Metals in Baby
Foods, Sparking National Outrage, and Instant Litigation ................................ 5

    III.  Defendants' Coordinated Conduct ................................................................. 11

         The Baby Food Council................................................................................ 11

    IV.  Procedural History ..................................................................................... 13

ARGUMENT ...................................................................................................................14

    I.    Centralization is Warranted for These Cases ............................................... 14

CONCLUSION ...............................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Actos Prods. Liab. Litig.*,
   840 F. Supp. 2d 1356 (J.P.M.L. 2011) ................................................................................. 16

*In re Ahern Rentals, Inc., Trade Secret Litig.*,
   481 F.Supp.3d 1355 (J.P.M.L. 2020) ................................................................................. 17

*In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*,
   148 F. Supp. 3d 1383 (J.P.M.L. 2015) ............................................................................... 15

*In re: Biomet M2A Magnum Hip Implant Prods. Liab. Litig.*,
   896 F. Supp. 2d 1339 (J.P.M.L. 2012) ............................................................................... 15

*In re ClassicStar Mare Lease Litig.*,
   528 F. Supp. 2d 1345 (J.P.M.L. 2007) ............................................................................... 19

*In re: Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*,
   190 F.Supp.3d 1361 (J.P.M.L. 2016) ................................................................................. 18

*In re: Farxiga (Dapagliflozin) Prods. Liab. Litig.*,
   273 F. Supp. 3d 1380 (J.P.M.L. 2017) ........................................................................ 15, 16

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
   249 F.Supp.3d 1357 (J.P.M.L. 2017) ................................................................................. 18

*In re MLR, LLC, Patent Litig.*,
   269 F. Supp. 2d 1380 (J.P.M.L. 2003) ............................................................................... 15

*In re: Prempro Prods. Liab. Litig.*,
   254 F. Supp. 2d 1366 (J.P.M.L. 2003) ............................................................................... 16

*In re Proton Pump Inhibitor Prods. Liab. Litig. (No. II)*,
   261 F. Supp. 3d 1351 (J.P.M.L. 2017) ............................................................................... 15

*In re Sigg Switzerland (USA), Inc., Aluminum Bottles Mktg. & Sales Practices Litig.*,
   682 F. Supp. 2d 1347 (J.P.M.L. 2010) ............................................................................... 20

*In re: Taxotere (Doxetaxel) Eye Injury Prods Liab. Litig.*,
   MDL No. 3203, 2022 WL 303562 (J.P.M.L. Feb. 1, 2022) ........................................ 14, 16

*In re Viagra (Sildenafil Citrate) Prods. Liab. Litig.*,
   224 F.Supp.3d 1330 (J.P.M.L 2016) ................................................................................. 17

*In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*,

330 F. Supp. 3d 1378 (J.P.M.L. 2018)................................................................................. 14, 15

*Roundup Prods Liab. Litig.*,
  214 F. Supp. 1346 (J.P.M.L 2016)................................................................................. 17

**Statutes**

28 U.S.C. § 1407........................................................................................................ 14, 15, 17

**Other Authorities**

A Look at the Judicial Panel on Multidistrict Litigation,
  72 F.R.D. 211 (1977) ....................................................................................................... 18

Manual For Complex Litigation (Fourth) § 20.131 (2004) .......................................................... 18

## INTRODUCTION

These lawsuits concern a group of manufacturers and sellers of baby food products—specifically, Gerber Products Company (owned by Nestle, Inc.), Hain Celestial, Inc.; Nurture, Inc. (owned by Danone, Inc.); Walmart, Inc.; Sprout Foods Inc.; Plum Organics (formerly owned by Campbell Soup Company); and Beech-Nut Nutrition Company ("Defendants")—that sold certain baby food products ("Baby Foods") containing elevated levels of potent neurotoxins, namely lead, arsenic, and mercury ("Toxic Heavy Metals", "Heavy Metals", or "Metals").  All three Metals are well-known to the scientific community to cause brain damage in children at exceedingly low doses, with no threshold dose identified.  The Movants and plaintiffs ("Plaintiffs") are children who were exposed to elevated quantities of Toxic Heavy Metals from consumption of Defendants' Baby Foods during the most sensitive developmental periods of early life and, as a result, suffered brain injury.  Such brain injury manifested in diagnoses of the neurodevelopmental conditions autism spectrum disorder ("ASD") and/or attention deficit hyperactivity disorder ("ADHD").  Dozens of epidemiological studies show that babies exposed to lead, arsenic, and mercury develop ASD and ADHD—which is why metals like lead are considered, by the FDA, capable of causing neurodevelopmental defects in children at doses commonly found in the Defendants' foods.  **Ex. 1** FDA Lead Guidance at 5.

The 11 actions identified in the included Schedule of Actions involve the same products

(Baby Foods)[2], the same toxins (lead, arsenic, and mercury), the same injuries ASD/ADHD, and

the same constellation of Defendants (Gerber, Nestle, Hain, Beech-Nut, Nurture, Danone, Plum,

Campbell, Walmart, and Sprout).  The 11 actions are filed by 10 different law firms, in 7

different federal district courts alleging the same wrongful conduct on the part of the common

constellation of Defendants.  The undersigned law firm currently has over 3,556 additional

plaintiffs under contract and investigation who allege similar allegations. Several other law firms

who have been litigating these cases separately have similar volumes of claimants under contract

and investigation.

All actions, including the Movants' actions, actions by other plaintiffs, and by future

plaintiffs, involve common questions of law and fact—each plaintiff developed brain injury

which manifested as either ASD, ADHD, or both because of exposure to Heavy Metals in

Defendants' Baby Food products.  Transfer for centralization and pretrial coordination is

appropriate because each of the related Actions and any tag-along cases arise out of the same or

similar nucleus of operative facts, arise out of the same or similar alleged wrongful conduct,

involve the resolution of the same or similar questions of fact and law, involve the same or

similar scientific and/or medical evidence, and discovery will be substantially similar and

involve many of the same documents and witnesses. Significantly, core elements of Plaintiffs'

claims arise out of industry-wide coordination between Defendants and a common pattern and

---

[2] Although each Defendant manufacturers and/or sells its own line of Baby Food products, there is significant overlap between categories and flavors of Baby Foods marketed by Defendants and consumed by Plaintiffs.  Generally, the Baby Foods in these cases can be organized into the following groups: Jars/Tubs; Pouches; Puffs; Cereals; Snacks; and Yogis (yogurt-based foods). And, it should be noted that not all of Defendants' Baby Foods are contaminated with dangerous levels of Metals.  Indeed, all of the Defendants sell products that contain non-detectable levels of Heavy Metals.  Rather, ingredient and formulation decisions such as the use of rice (a significant source of arsenic), certain root vegetables (a significant source of lead), and certain premix minerals and vitamins (source of significant lead and arsenic), drive up contamination in a proportion of Defendants' Baby Foods.

practice of wrongful conduct.  For example, between 2019 and 2021, most of the Defendants (Beech-Nut, Campbell, Gerber, Hain, Nurture, and Sprout) were involved in a consortium known as the Baby Food Council that was specifically organized for the purpose of dealing with the issue of Heavy Metal contamination of Defendants' Baby Foods.  The Defendants' actions (or lack thereof) arising out of their coordinated involvement in The Council, as explained further below, will be directly relevant to Plaintiffs' causation claims and elements of liability such as punitive damages.  Furthermore, several of the Defendants hold co-manufacturing agreements between each other to produce the Baby Foods, routinely use common suppliers to source the same ingredients for the Baby Foods, and contract with overlapping third-party laboratories to conduct Heavy Metal testing of their Baby Foods.  Indeed, yet another common thread tying these Defendants together is the Congressional probe into the Heavy Metal contamination of Baby Foods that resulted in two published reports in 2021 bringing the issue to widespread public light.  As discussed below, Congress concluded that Defendants' negligence and recklessness stems from a common pattern and practice of, *inter alia*, 1) failing to adequately test their Baby Foods for known neurotoxins; 2) marketing products notwithstanding internal testing revealing Heavy Metal quantities far above Defendants' own internal limits and available regulatory limits; 3) failing to set and enforce adequate limits for the presence of the contaminants; and 4) sourcing ingredients and making formulation decisions which drastically drive up the Metal levels in the Baby Foods.  Such common facts, and more, weigh strongly in favor of coordinated proceedings, to allow the common issues to be addressed by one Court.

Each Baby Food case requires extensive discovery concerning the safety, development, and marketing of Baby Foods.  Each Plaintiff will need to conduct the same complicated scientific, regulatory, and liability discovery to demonstrate that exposure to the Heavy Metals in the Baby Foods substantially contributed to their respective brain injury.  To date, one of the

currently pending Baby Food cases is in the advanced stages of discovery (with a trial date slated for the summer of 2024) while other cases are in the early stages of litigation.  In the absence of coordination, discovery will be conducted under different, and likely conflicting, judicial constraints and orders.  Centralizing these cases before one MDL Judge to ensure that the discovery is done once, and for all claimants, makes sense.

## FACTUAL BACKGROUND

I.   **Exposure to Heavy Metal in Early Life Can Cause Brain Injury Which Presents as ASD/ADHD**

There is near consensus within the scientific community that conditions such as ASD and ADHD arise because of an interaction between genes and the environment.  As a 2019 publication by the National Institute of Environmental Health Sciences ("NIH") makes clear, "research shows that both genetics and environmental factors likely play a role in autism spectrum disorder (ASD)."  **Ex. 2**, NIH, *ASD & The Environment* (April 2019) ("NIH Pub") at 1 **Ex. 3**, NIH, *Autism* at 1 ("A growing area of research focuses on interaction of genetic and environmental factors.").  To that end, the scientific community has identified early life exposure to neurotoxic Heavy Metals as a contributor to ASD/ADHD risk.  To be clear, these metals have no useful function in the human body and all three are known neurotoxins.  In fact, every time scientists study a lower dose of exposure in children, they find that the metals do damage.  With respect to ASD, in an April 2019 publication titled "Autism Spectrum Disorder and the Environment", the NIH observed that "early childhood exposure to heavy metals … may be linked to autism spectrum disorder."  **Ex. 2**, NIH Pub. at 2.  Moreover, on its "Health and Education" page concerning ASD, the NIH summarizes some of the current research on the environmental component of ASD and specifically states that "early childhood exposure to heavy metals, like mercury, lead, or arsenic…cause concern."  **Ex.** 3, NIH, *Autism* at 2.

4

The NIH is not an outlier.  In August 2020, the ATSDR—a division of the CDC—concluded that low doses of lead exposure in early childhood are associated with "attention deficits, hyperactivity, *autistic behaviors*, conduct disorders, and delinquency."  **Ex. 4**, Lead Tox Profile at 133 (emphasis added).  The agency also noted, based on "prospective studies", that such "autistic behavior" and "attention deficits" following lead exposure have been observed during the "neonatal or early childhood" phase of development.  *Id*. at 173.

The underlying scientific literature upon which such conclusions are based is robust.  The data ranges from epidemiological and toxicological studies assessing the relationship between exposure to metals during pre-, peri, and post-natal stages of development and the subsequent risk of brain injury and ASD.  And, the overwhelming weight of the literature—observed in different studies, conducted during different time periods, by different researchers employing a variety of study designs, in different parts of the world—demonstrates that early life exposure to heavy metals can cause brain injury which manifests as ASD.  That is why, as early as 2016, a large consortium of the most well-respected scientists, physicians, and medical organizations in the U.S. published a consensus statement which identified metals such as lead and mercury as "*prime examples* of toxic chemicals that can contribute to learning, behavioral, or intellectual impairment, as well as specific neurodevelopmental disorders such as ADHD or autism spectrum disorder[.]"  **Ex. 5**, TENDR Consensus Statement at A118-A119 (emphasis added).

## II.    Congressional Investigation Finds Substantial Presence of Heavy Metals in Baby Foods, Sparking National Outrage, and Instant Litigation

On February 4, 2021, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, published a report detailing its findings that Toxic Heavy Metals—including lead, arsenic, and mercury—were present in "significant levels" in numerous commercial baby food products.  *See* **Ex. 6**, First Congressional

Report.  Four companies—Hain, Gerber, Nurture, and Beech-Nut—produced internal testing policies, test results for ingredients and finished products, and documentation about what the companies did with ingredients and/or finished products that exceeded their internal testing limits.  *Id*. at 2.  Three companies—Plum,[3] Walmart, and Sprout—refused to cooperate.  *Id*.

Congress reported that the data submitted by the companies unequivocally revealed that a substantial number of the companies' finished products and/or ingredients used to manufacture the Baby Foods are tainted with significant levels of Toxic Heavy Metals, namely lead, arsenic and mercury.  *Id*. at 2-3.  And, where the Defendants did set internal limits for the amount of metals they allowed in their foods, Defendants routinely flouted their own limits and sold foods that consistently tested above their limits—facts which have been further corroborated by discovery conducted in state court Baby Food litigation.

**Nurture/Danone (HappyBABY).**  Nurture sold baby foods after tests showed they contained as much as 180 parts per billion (ppb) inorganic arsenic. Over 25% of the products Nurture tested before sale contained over 100 ppb inorganic arsenic. Nurture's testing shows that the typical baby food product it sold contained 60 ppb inorganic arsenic.  Nurture sold finished baby food products that tested as high as 641 ppb lead. Almost 20% of the finished baby food products that Nurture tested contained over 10 ppb lead.  Moreover, Nurture sold finished baby food products containing as much as 10 ppb mercury.

**Hain (Earth's Best Organic).**  Hain sold finished baby food products containing as much as 129 ppb inorganic arsenic. Hain typically only tested its ingredients, not finished products. Documents show that Hain used ingredients testing as high as 309 ppb arsenic.  Hain

---

[3] Plum's parent corporation, Campbell's, responded to the Subcommittee's inquiries, and the Subcommittee Report references the parent corporation as opposed to Plum.  However, as Plum is the Defendant in this lawsuit, any references to the Subcommittee's findings regarding Campbell are attributed to Plum.  The same Baby Foods are at issue.

used ingredients containing as much as 352 ppb lead.  Hain used many ingredients with high lead content, including 88 that tested over 20 ppb lead and six that tested over 200 ppb lead.  And, Hain does not even test for mercury in its baby food.  Congressional Rpt. at 2-4.  However, independent testing by HBBF of Hain's Baby Foods confirms that Hain's products contain as much as 2.4 ppb of mercury.  *See* HBBF Rpt. at 19.

**Beech-Nut.**  Beech-Nut used ingredients after they tested as high as 913.4 ppb arsenic. Beech-Nut routinely used high-arsenic additives that tested over 300 ppb arsenic to address product characteristics such as "crumb softness."  On June 8, 2021, four months following the Congressional findings, Beech-Nut issued a voluntary recall of its infant single grain rice cereal and exited the rice cereal market completely.[4]  In its recall, Beech-Nut confirmed that its products exceed regulatory arsenic limits.[5]  And, Beech-Nut used ingredients containing as much as 886.9 ppb lead, as well as 483 products that contained over 5 ppb lead, 89 that contained over 15 ppb lead, and 57 that contained over 20 ppb lead.  In a follow-up report in September 2021 focused on Defendants Beech-Nut and Gerber's infant rice cereals, Congress noted that Beech-Nut rice cereal tested up to 125 ppb inorganic arsenic and averaged 85.47 ppb inorganic arsenic. **Ex. 7**, Second Congressional Report.  Beech-Nut's practice of testing ingredients, rather than finished products, for Toxic Heavy Metals appears to have contributed to its failure to detect the dangerous inorganic arsenic levels in its recalled products.  Lastly, Beech-Nut does not even test for mercury in baby food.

---

[4] FDA, *Beech-Nut Nutrition Company Issues a Voluntary Recall of One Lot of Beech-Nut Single Grain Rice Cereal and Also Decides to Exit the Rice Cereal Segment,* available at: https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/beech-nut-nutrition-company-issues-voluntary-recall-one-lot-beech-nut-single-grain-rice-cereal-and
[5]*Beech-Nut to stop selling baby rice cereal after finding high arsenic levels* (CNN, June 9, 2021), available at:
 https://www.cnn.com/2021/06/09/health/beech-nut-baby-food-recall-wellness/index.html.

**Gerber/Nestle.**  Gerber used high-arsenic ingredients, using 67 batches of rice flour that had tested over 90 ppb inorganic arsenic.  Gerber used ingredients that tested as high as 48 ppb lead; and used many ingredients containing over 20 ppb lead.  Gerber rarely tests for mercury in its baby foods.  In the September 2021 follow-up Congressional report, it was revealed that Gerber's rice cereal tested up to 116 ppb inorganic arsenic, and its average rice cereal product contained 87.43 ppb inorganic arsenic, which is even higher than the amount contained in Beech-Nut's average rice cereal product. While Beech-Nut recalled some of its products and completely discontinued sales of its rice cereal, Gerber has taken no such actions to protect children.

**Plum/Campbell**.  Plum refused to cooperate with the Congressional investigation. Instead of producing any substantive information, Plum provided Congress with a self-serving spreadsheet declaring that every one of its products "meets criteria",[6] while declining to state what those criteria were.  Disturbingly, Plum admitted that, for mercury (a powerful neurotoxin), the company has *no criterion* whatsoever, stating: "No specific threshold established because no high-risk ingredients are used."  **Ex. 6**, Congressional Rpt. at 44-45.  However, despite Plum having no mercury threshold, it still marked every food as "meets criteria" for mercury.  The Subcommittee noted that "[t]his misleading framing—of meeting criteria that do not exist—raises questions about what [Plum's] other thresholds actually are, and whether they exist."  *Id*. at 45.  This suspicion is confirmed by HBBF's independent testing which confirms the presence of Toxic Heavy Metals in Plum's Baby Food, which found excess levels of lead, arsenic, and mercury in Plum's Just Sweet Potato Organic Baby Foods; Just Peaches Organic Baby Food; Just Prune Organic Baby Food; Pumpkin Banana Papaya Cardamom; Apple, Raisin & Quiona Organic Baby Food; Little Teethers Organic Multigrain Teething Wafers-Banana with Pumpkin;

---

[6] Campbell, *Product Heavy Metal Test Results* (Dec. 11, 2019), available at: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/12.pdf).

and Mighty Morning Bar-Blueberry Lemon-Tots.  Furthermore, based upon discovery conducted in related toxic Baby Food litigation, Movants submit that Plum's pattern and practice of failing to test ingredients, willingly flouting its own internal standards, and selling products notwithstanding internal acknowledgement of their high metal content, follows that of the other Defendants discussed herein, and common discovery will further flesh out the extent of Plum's culpable conduct.

**Sprout Foods**.  Sprout did not respond to Congress at all. Again, the testing conducted by HBBF confirms that Sprout's Baby Foods - specifically the "Organic Quiona Puffs Baby Cereal Snack-Apple Kale and Carrot Apple Mango Organic Baby Food – are similarly tainted by substantial amounts of Toxic Heavy Metals.  Furthermore, based upon discovery conducted in related toxic Baby Food litigation, Movants submit that Sprout's pattern and practice of failing to test ingredients, willingly flouting its own internal standards, and selling products notwithstanding internal acknowledgement of their high metal content, follows that of the other Defendants discussed herein, and common discovery will further flesh out the extent of Sprout's culpable conduct.

**Walmart**.  Like Plum and Sprout, Walmart refused to cooperate with the Congressional investigation.  Again, however, independent data confirms that Walmart's baby foods companies is similarly tainted.  For example, the HBBF Report observed that Walmart's Parent's Choice brand products contain 66 ppb inorganic arsenic, 26.9 ppb lead, 26.1 ppb cadmium, and 2.05 ppb mercury. *See* HBBF Report at 21, 22, 25-27.  Moreover, Walmart did not require any of the manufacturers of its Parent's Choice brand of baby food products to test the ingredients or finished products for heavy metals; and restricted any testing to a limited number of products containing select ingredients such as fruit juices, leaving the vast majority of its product line untested for metals.  In fact, based upon information and belief, instead of striving to drive down

metal levels in its products, Walmart increased, five-fold, the amount of arsenic that it allowed in its brand baby food.  Furthermore, based upon discovery conducted in related toxic Baby Food litigation, Movants submit that Walmart's pattern and practice of failing to test ingredients, willingly flouting its own internal standards, and selling products notwithstanding internal acknowledgement of their high metal content, follows that of the other Defendants discussed herein and common discovery will further flesh out the extent of Walmart's culpable conduct.

The metal concentrations discussed above greatly surpass the limits allowed by U.S. regulatory agencies. There are no FDA regulations governing the presence of Toxic Heavy Metals in most Baby Foods with the exception of 100 ppb inorganic arsenic in infant rice cereal and proposed (not yet final) limits for lead in certain baby food categories that were announced by the agency, for the first time, in January 2023.  *See* **Ex. 1**, FDA Lead Guidance.  To the extent such regulations exist, the quantities of Toxic Heavy Metals in Defendants' Baby Foods far exceed any permissible FDA levels.  To be sure, the FDA has set the maximum contaminant levels ("MCL") in bottled water at 10 ppb inorganic arsenic, 5 ppb lead, and the EPA has capped the allowable level of mercury in drinking water at 2 ppb.  However, these limits were created in reference to *adult* exposure, not infants.  Compared to these thresholds, the test results of the Defendants' Baby Foods and their ingredients are multiple folds greater than the permitted metal levels.

Moreover, compounding these troubling findings, the Defendants set internal limits for the presence of Toxic Heavy Metals in their foods that were, themselves, dangerously high and then routinely failed to abide by those inadequate standards, as discussed below.  For example, Congress found that Hain (Earth's Best Organic) set an internal standard of 200 ppb for arsenic and lead in some of its ingredients.  But Hain routinely exceeded its internal policies, using ingredients containing 353 ppb lead and 309 ppb arsenic.  Hain justified these deviations based

on "theoretical calculations," even after Hain admitted to FDA that its testing *underestimated* final product toxic heavy metal levels. **Ex. 6**, Congressional report at 4-5.

As found by Congress, the Defendants have willfully sold—and continue to sell—contaminated Baby Foods notwithstanding their full awareness of these unacceptably high levels of Toxic Heavy Metals in their products. In August 2019, Hain held a closed-door meeting with the FDA during which Hain delivered a presentation to the agency acknowledging the Toxic Heavy Metal problem in its Baby Food. *Id.* at 53-54. In the PowerPoint slides presented during the meeting—only made public by the Subcommittee—Hain confirmed that some of the ingredients in its Baby Food contain as much as between 108 to 129 ppb of arsenic, specifically noting "[p]reliminary investigation indicates Vitamin/Mineral Pre-Mix may be a major contributing factor." *Id.*

## III.   Defendants' Coordinated Conduct

### The Baby Food Council

In 2019, as concerns grew over contamination of certain Baby Foods on the U.S. market, a consortium of Baby Food manufacturers comprised of Defendants Beech-Nut, Campbell (Plum), Gerber (Nestle), Hain, Nurture (Danone), and Sprout as well as certain interested third party groups such as the Environmental Defense Fund ("EDF") and Healthy Babies Bright Futures ("HBBF") were formed with the intention "of reducing heavy metals in young children's food."[7] The consortium was named the Baby Food Council ("BFC"). The BFC involved the sharing of common testing data on the levels of metal contamination of Defendants' Baby Foods, a grant to Cornell University to further study the issue, and a proposed "voluntary Baby Food

---

[7] https://www.edf.org/media/baby-food-council-taking-challenge-reducing-heavy-metals-young-kids-food.

Standard to limit the amounts of heavy metals in baby food."[8]  Specifically, the Baby Food Standard "would have provided companies with a common framework for progressively reducing contaminants by regularly testing products and improving management practices, and for being transparent with consumers about the safety of their products."[9]  However, by 2021, the Defendants "all decided to backpedal on this project—even though the standard was designed to protect babies' brain development."[10]  In short, the Defendants opted to continue "self-regulating", the same self-regulation which exposed—and continued to expose—Plaintiffs to elevated levels of neurotoxic Metals in Defendants' Baby Foods.

### A. Defendants' Co-Manufacturing of Baby Foods and Use of Overlapping Testing Laboratories and Suppliers

As unearthed by discovery in state court Baby Food litigation, some of the Defendants hold co-manufacturing agreements ("co-mans") to produce the Baby Foods.  In essence, such arrangements involve one Defendant manufacturing a line of Baby Food products, such as rice cereal, for another Defendant to then market under its own brand.  Co-man agreements often involve the sharing of Heavy Metal test results for the Baby Foods, exchange of information regarding suppliers of ingredients for Baby Foods, manufacturing practices, audits, and other facts central to Plaintiff's claims and that will be subject to the same discovery in each case.

Furthermore, much of the Heavy Metal testing of Baby Foods and their constituent ingredients was conducted by a common constellation of labs using similar, if not identical, methods of testing.  Similarly, the Defendants used overlapping suppliers for the ingredients of

---

[8] https://www.hbbf.org/blog/2021-11/hbbf-leaves-baby-food-council-after-baby-food-companies-backpedal-commitments.
[9] https://www.edf.org/media/edf-and-healthy-babies-bright-futures-withdraw-baby-food-council-after-companies-block-work.
[10] https://www.hbbf.org/blog/2021-11/hbbf-leaves-baby-food-council-after-baby-food-companies-backpedal-commitments/.

the Baby Food products.  This is important because a significant factor behind the elevated levels of Metals in Defendants' foods is the source of the ingredients that make up the finished product. For example, there is evidence that much of the rice and other grains used by Defendants came from common agricultural regions with high historical levels of arsenic and lead contamination—arsenic and lead which then ends up in the rice cereal regularly consumed by a baby during key stages of development.  Again, a central element of Plaintiffs' discovery will be the same across cases, weighing heavily in favor of centralizing proceedings.

## IV.  Procedural History

On March 8, 2021, a group of plaintiffs pursuing class action claims against Defendants related to the sale and marketing of Baby Foods filed a Motion to Transfer the class actions as well as any pending personal injury claims related to Baby Foods.  *See In Re: Baby Food Marketing, Sales Practices and Products Liability Litigation* (MDL No. 2997) at Dkt. 1. Undersigned counsel representing Movants here submitted an interested party response opposing the Motion on behalf of plaintiffs in pending personal injury cases at the time.  *Id*. at Dkt. 121. The primary argument against centralizing the personal injury cases with the class actions was two-fold: 1) there were, at the time, an insufficient number of personal injury cases such that informal coordination was feasible; and 2) the personal injury claims are materially different than those of the class actions seeking purely economic damages under widely different theories of liability.  *See* Dkt. 121 at 12-15.  The Panel ultimately denied centralization of both the class and personal injury actions, considering the strong opposition to centralization by a large number of plaintiffs and all of the defendants, the lack of any claims relating to coordination amongst the defendants, and the fact that most of the defendant-specific actions had been transferred to the district where that defendant was headquartered.  *Id*. at Dkt. 212.

Here, by contrast, as described above, discovery in state court litigation has fleshed out

the significant extent to which Plaintiffs' claims arise out of coordinated conduct between

Defendants.  And, unlike with the prior class action cases, there are no defendant-specific actions

that have been transferred to a district where a defendant is headquartered.  Such facts and more

as described herein, warrant centralization before one court.

<u>**ARGUMENT**</u>

**I.      Centralization is Warranted for These Cases**

**A.  Consolidation is Appropriate Under Section 1407**

Under 28 U.S.C. § 1407, the Panel may consolidate multiple cases if the moving parties

sufficiently demonstrate that: 1) the lawsuits involve one or more common questions of fact; 2)

consolidation will best serve the convenience of the parties and witnesses; and 3) consolidation

will promote the just and efficient conduct of such lawsuits.  28 U.S.C. § 1407(a).  As shown

herein, the Baby Food cases meet the statutory requirements for centralization, and on this

record, centralization in one district court for pre-trial proceedings is the most appropriate course

of action for the Panel to take.  *See, e.g.*, *In re: Taxotere (Doxetaxel) Eye Injury Prods Liab.*

*Litig.*, MDL No. 3203, 2022 WL 303562, at \*1-\*3 (J.P.M.L. Feb. 1, 2022) (recently granting

centralization of thirteen lawsuits filed against Sanofi-Aventis U.S. LLC and Sanofi US Services

Inc. arising out of eye injuries suffered by Taxotere users); *see also In re Zostavax (Zoster*

*Vaccine Live) Prods. Liab. Litig.*, 330 F. Supp. 3d 1378, 1379 (J.P.M.L. 2018) (granting

defendant's motion for centralization in cases wherein plaintiffs alleged they had suffered

various types of injuries, including encephalitis, optical nerve damage, kidney and liver damage,

Bell's palsy, Guillain Barre Syndrome, and other injuries as due to Merck's shingles vaccine).

First, each Baby Food lawsuit alleges identical facts against the same constellation of

Defendants concerning the exact same toxins in Defendants' Baby Food products.  Each lawsuit

contains identical allegations about Baby Foods and the propensity of Metal exposure through

14

consumption of Baby Food to cause brain injury.  In turn, Defendants will deny Plaintiffs'

allegations.  These defenses will involve common questions of fact on both liability and

causation.

Second, centralization before one MDL court will prevent inconsistent judicial rulings,

would eliminate duplicative discovery, will be more convenient to the parties, witnesses, and

their counsel, and will conserve the resources of the judiciary, the parties, and their counsel. *See,

In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, 330 F. Supp. 3d at 1379 (highlighting

that consolidation will eliminate duplicative discovery, prevent inconsistent pretrial rulings on

*Daubert* issues and other pretrial matters, and conserve resources); *In re MLR, LLC, Patent

Litig.*, 269 F. Supp. 2d 1380, 1381 (J.P.M.L. 2003) (consolidation before a single transferee

judge allows for consideration of "all parties' legitimate discovery needs while ensuring that

common parties and witnesses are not subjected to discovery demands which duplicate activity

that has already occurred or is occurring in other actions.").[11] A transferee judge can "employ

any number of techniques … to manage pretrial proceedings efficiently." *In re Proton Pump

Inhibitor Prods. Liab. Litig. (No. II)*, 261 F. Supp. 3d 1351, 1354 (J.P.M.L. 2017). Consequently,

"formal centralization under section 1407 is the best course." *Id*.

Indeed, because the lawsuits alleging injuries due to exposure to toxins via consumption

of Defendants' Baby Foods are based upon identical allegations, the parties will address identical

issues in discovery, especially those involving causation.  *In re Bair Hugger Forced Air

Warming Devices Prods. Liab. Litig.*, 148 F. Supp. 3d 1383, 1385 (J.P.M.L. 2015) (deeming

transfer appropriate where related actions shared factual issues related to allegations of injuries

---

[11] *See also In re: Farxiga (Dapagliflozin) Prods. Liab. Litig.*, 273 F. Supp. 3d 1380, 1380-83
(J.P.M.L. 2017) (same); *In re: Biomet M2A Magnum Hip Implant Prods. Liab. Litig.*, 896 F.
Supp. 2d 1339, 1340 (J.P.M.L. 2012) (same).

from a defective warming system); *see also In re Actos Prods. Liab. Litig.*, 840 F. Supp. 2d 1356 (J.P.M.L. 2011) (granting consolidation where: (1) the actions involved common questions of fact regarding whether the pharmaceutical drug could cause cancer and whether defendants concealed their knowledge of the risk and failed to provide adequate warnings, and (2) centralization would eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel, and the judiciary).

Finally, as noted above, the need for centralization is warranted because there are already 11 Baby Food lawsuits on file in 7 different federal district courts across the country. These lawsuits span 3 federal circuits.  Taken together, these cases will ultimately result in separate scheduling orders and duplicative discovery and pretrial practices if an MDL is not created. The panel should therefore authorize an MDL so that pretrial proceedings "will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties." *In re: Prempro Prods. Liab. Litig.*, 254 F. Supp. 2d 1366, 1368 (J.P.M.L. 2003); *see also In re: Taxotere (Doxetaxel) Eye Injury Prods Liab. Litig.*, MDL No. 3203, 2022 WL 303562, at *1 (granting centralization for 13 lawsuits); *In re: Farxiga*, 273 F. Supp. 3d at 1381-82 (granting centralization for 18 lawsuits that involved "allegations that ingestion of the drug Farxiga may cause a variety of injuries").

### B.  Informal Coordination is Impractical

Informal coordination is not a practical alternative to centralization for these cases. "[T]he number of actions, districts, and involved counsel, and the complexity of the litigation, make effective coordination on an informal basis impracticable."  *In re Uber Tech., Inc., Data Breach Litig.*, 304 F.Supp.1351, 1354 (J.P.M.L. 2018) (informal coordination was not a practicable alternative to centralization where ten actions, with a potential for seven more, were pending in nine districts).  It would be inefficient and uneconomical to engage in informal

coordination amongst so many different cases, districts, and involved counsel, and as previously discussed, attempts at informal coordination of the first five filed cases proved to be futile and impractical.  *See In re: Roundup Prods Liab. Litig.*, 214 F. Supp. 1346, 1348 (J.P.M.L 2016) (concluding informal coordination of 37 actions pending in 21 districts was not practicable).

"The number of involved districts … pose[s] [a] significant obstacle[] to informal coordination" especially for discovery.  *In re Viagra (Sildenafil Citrate) Prods. Liab. Litig.*, 224 F.Supp.3d 1330, 1331 (J.P.M.L 2016). As is common in an MDL proceeding, Plaintiffs anticipate taking the depositions of treating physicians, third-party witnesses, and current and former employees of Defendants, many of whom will be deposed in multiple cases or will discuss overlapping issues.  It would be very difficult to informally coordinate the timing and scope of this discovery across numerous cases in different stages of litigation. "[A] single court can more effectively manage the discovery disputes … likely to arise, including those relating to discovery from third party witnesses, depositions of apex witnesses, and the scope of relevant discovery, generally."  *In re Ahern Rentals, Inc., Trade Secret Litig.*, 481 F.Supp.3d 1355, 1356 (J.P.M.L. 2020) (granting consolidation in lieu of informal coordination for ten actions pending in eight districts).  Centralization of these proceedings, rather than informal coordination, would thus be more convenient for the parties and witnesses and would "promote the just and efficient conduct of such actions."  28 U.S.C. § 1407 (a).

Furthermore, with no centralized process, duplicative staggered motions will result in inconsistent rulings on nearly identical motions and underlying facts.  This becomes particularly likely for *Daubert* and summary judgment motions, given the complex medical, scientific, and legal concepts at issue in these actions.  A single Court reviewer will achieve far greater consistency than the efforts of multiple judges and parties across the country.  This is particularly true considering the large amount of third-party discovery that will need to be conducted on

supplier and Co-Mans.  Having different presiding courts and different subpoena-enforcement courts will lead to innumerable inconsistent rulings regarding the scope of third-party discovery. "Were this litigation smaller, such duplicative discovery and motion practice might be effectively coordinated on an informal basis by the parties and involved courts." *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*, 190 F.Supp.3d 1361, 1362 (J.P.M.L. 2016). But "[c]entralization of these … actions before a single judge will yield greater efficiency and cost benefits for both the parties and the courts than informal cooperation and coordination can achieve." *Id.* at 1363 (holding that "centralization [was] the best option" for that litigation involving twenty actions in separate district courts).

Additionally, as cases are guided by different scheduling orders, motions are filed and ruled upon at different times, which means that unsuccessful matters in one jurisdiction can be re-framed and re-litigated in other jurisdictions. This incentivizes forum shopping and places a strain on the judiciary.  Informal coordination cannot practically eliminate these risks within so many cases and districts.  MDL "[c]entralization will eliminate duplicative discovery, prevent inconsistent pretrial rulings on *Daubert* and other issues, and conserve the resources of the parties, their counsel, and the judiciary." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 249 F.Supp.3d 1357, 1361 (J.P.M.L. 2017).

C. **There Are Several Appropriate Venues for These Cases**

The selection of a transferee court is based on a balancing test of several factors, none of which is dispositive.  *See* Manual For Complex Litigation (Fourth) § 20.131 (2004) (citing Robert A. Cahn, A Look at the Judicial Panel on Multidistrict Litigation, 72 F.R.D. 211, 214-15 (1977)).  These factors include "where the largest number of cases is pending, where discovery has occurred, where cases have progressed furthest, the site of the occurrence of the common facts, where the cost and inconvenience will be minimized, and the experience, skill, and

caseloads of available judges." *Id*.  Due to the infancy of this litigation in federal court, many of these factors are not applicable.  For example, only one case has progressed in any meaningful way, whereas there has been no discovery in any of the other actions.  And, the list of Defendants is already fairly numerous and they are located throughout the United States, on both sides of the country.  *See, e.g.*, *In re ClassicStar Mare Lease Litig.*, 528 F. Supp. 2d 1345, 1347 (J.P.M.L. 2007) ("Given the many parties and interests involved, there is no perfect choice for the transferee court.").  Against this background, Plaintiffs propose any of the following courts as appropriate venues for this MDL:

**District of Nevada**.  Currently, there are 2 actions pending in this court involving 8 Plaintiffs.  And, the *D.M.P., et al. v. Beech-Nut Nutrition Company, Inc.*, *et al.* (No. 2:23-cv-00344) case is the second earliest filed Baby Food federal court case.  The actions are overseen by the Hon. Cristina D. Silva.  The District of Nevada is a well-resourced court and Judge Silva is currently not overseeing any MDLs.  And, although the actions here are in the early stages, J. Silva recently denied Defendants' joint motion to sever Plaintiffs' claims.

**Northern District of California**.  There are currently 3 actions pending in this court involving 4 Plaintiffs and overseen by the Hon. Jacqueline Scott Corley.  The Northern District of California has a long and distinguished track record handling numerous large, complex MDLs.

**Central District of California**.  There are currently 2 actions pending in this court involving 2 Plaintiffs.  The actions have been assigned to the Hon. Fred W. Slaughter.  A factor weighing in favor of centralizing these actions in the Central District of California is the fact that a substantial portion of the events giving rise to the claims in this litigation are likely to be centered in the agricultural powerhouse of the central valley within the Central District of California.  For example, of the ingredients Defendant Nurture sources domestically, well over

19

75% are grown at least in part on farms on the West Coast including in California.[12]

**Eastern District of Louisiana**.  This court hosts the first-filed Baby Food personal injury federal action *Watkins, et al. v. Nurture, LLC, et al.* (Case No. 2:22-cv-00551), currently overseen by the Hon. Darrel James Papillion.  *See In re Sigg Switzerland (USA), Inc., Aluminum Bottles Mktg. & Sales Practices Litig.,* 682 F. Supp. 2d 1347, 1349 (J.P.M.L. 2010) ("[W]here the first-filed action is pending, stands out as an appropriate transferee forum.").   This is by far the most advanced case, with a trial date of August 12, 2024.  The parties are in the midst of wrapping up fact discovery and expert disclosures are slated to occur in late January and February, 2024.  And, Judge Papillion and Magistrate Judge Donna Phillips Currault have to date adjudicated numerous disputes and are intimately familiar with the issues of the Baby Food litigation. That said, Movants respectfully request that the *Watkins* case be carved out of any centralized proceeding given the advanced stage of the case and imminent trial date.  The parties in *Watkins* are on the brink of submitting expert reports and wrapping up fact discovery. Thus, although Movants submit that the Eastern District of Louisiana before Judge Papillion is an appropriate MDL venue, Movants request that *Watkins* not be centralized with the other cases identified in the Schedule of Actions.

<u>**CONCLUSION**</u>

Movants respectfully request that the Court **GRANT** this Motion to Transfer and centralize the instant actions in any of the proposed courts identified above.

Dated:  January 4, 2024                              Respectfully submitted,

                                              */s/ Pedram Esfandiary*
                                              Pedram Esfandiary (SBN: 312569)
                                              pesfandiary@wisnerbaum.com
                                              **WISNER BAUM, LLP**
                                              11111 Santa Monica Blvd., Suite 1750

---

[12] Happy Family Organics, *Happy Farms*, https://www.happyfamilyorganics.com/happy-farms/ (last visited Apr. 12, 2021).

Los Angeles, CA  90025
Telephone:  (310) 207-3233
Facsimile:  (310) 820-7444

*Counsel for Plaintiffs A.A., and M.A., minors represented by their mother and Guardian ad Litem Vanity Vale-Ayala; D.S., a minor, represented by his mother and Guardian ad Litem Tamera Wilson; M.H., a minor, represented by his mother and Guardian ad Litem Marwa Amer; D.M.P., a minor child by and through his legal guardian, Annie Pompa Morejon; C.V.P., a minor child by and through his legal guardian, Ruby Perez Chino; C.R.C., a minor child by and through his legal guardian, America Cardona; J.P. a minor child by and through his legal guardian, Jesenia Plascencia; D.P,U. a minor child by and through his legal guardian Margaret Patneaud; E.R., a minor child by and through his legal guardian Fanny Lopez; and A.M., a minor child by and through his legal guardian Adriana Munoz.*