**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| |
|---|
| **IN RE BABY FOOD MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION (NO. II)** |

**MDL No. 3101**

**RESPONSE OF DEFENDANTS BEECH-NUT NUTRITION COMPANY, WALMART
INC. GERBER PRODUCTS COMPANY, THE HAIN CELESTIAL GROUP INC.,
SPROUT FOODS, INC., PLUM PBC, AND CAMPBELL SOUP COMPANY
IN OPPOSITION TO MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     PROCEDURAL HISTORY OF THE LITIGATION ......................................... 3

III.    BABY FOOD, HEAVY METALS, AND THE SCIENCE OF ASD .............................. 6

IV.     THE MOTION FOR CENTRALIZATION SHOULD BE DENIED ............................. 12

V.      THE SOUTHERN DISTRICT OF NEW YORK WOULD BE AN
        APPROPRIATE FORUM IF THE PANEL DECIDES TO CENTRALIZE THE
        LITIGATION ................................................................................................. 16

VI.     CONCLUSION ................................................................................................. 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Acetaminophen – ASD-ADHD Prods. Liab. Litig.*,
    MDL 3043, Dkt. 1381 (Dec. 18, 2023).........................................................................11, 19, 20

*In re AOL Time Warner, Inc.*,
    235 F. Supp. 2d 1380 (J.P.M.L. 2002)..................................................................................17

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.*,
    357 F. Supp. 3d 1391 (J.P.M.L. 2018)..................................................................................20

*In re Bard IVC Filters Prods. Liab. Litig.*,
    122 F. Supp. 3d 1375 (J.P.M.L. 2015)..................................................................................20

*In re Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litig.*,
    804 F. Supp. 2d 1376 (J.P.M.L. 2011).................................................................................3, 12

*In re Cable Tie Patent Litig.*,
    487 F. Supp. 1351 (J.P.M.L. 1980)......................................................................................12

*In re Covidien Hernia Mesh Prods. Liab. Litig.*
    MDL 2593 (J.P.M.L. Aug. 7, 2020) .....................................................................................13

*In re Cymbalta (Duloxetine) Prods. Liab. Litig.*,
    65 F.Supp.3d 1393, MDL No 2576 (J.P.M.L. Dec. 10, 2014) ....................................13, 14, 16

*In re Eliquis (Apixaban) Prods. Liab. Litig.*,
    MDL No. 2754..................................................................................................................19

*In re Farxiga (Dapagliflozin) Prod. Liab. Litig.*,
    273 F. Supp. 3d 1380 (J.P.M.L. 2017)..................................................................................17

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
    249 F. Supp. 3d 1357 (J.P.M.L. 2017)..................................................................................17

*NC v. Hain Celestial Group, et al.*
    (L.A. Super. Ct. Aug. 24, 2023)............................................................................................5

*NC v. Hain Celestial Group, Inc, et al.*
    (L.A. Super. Ct. Jan. 9, 2024) ...............................................................................................5

*In re Neurografix ('360) Patent Litigation*,
    936 F. Supp. 2d 1376 (J.P.M.L. 2013)..................................................................................17

*In re Nine West LBO Secs. Litig.*,
    464 F. Supp. 3d 1383 (J.P.M.L. 2020) ................................................................. 17

*Palmquist et al. v. The Hain Celestial Group, Inc., et al.*
    (S.D. Tex. Feb. 17, 2023) ......................................................................... 4, 20

*Pourdanesh et al. v. Hain Celestial Group, Inc.*
    No. 23stcv03484 (L.A. Super. Ct. Feb 6, 2024) .......................................... 6

*Pourdanesh et al. v. Hain Celestial Group, Inc.*
    No. 23stcv03484 (L.A. Super. Ct. Jan. 30, 2024) ....................................... 5

*In re Procter & Gamble Aerosol Prods.*,
    600 F. Supp. 3d 1343 (J.P.M.L. 2022) ........................................... 17, 18

*In re Sprint Premium Data Plan Mktg. & Sales Pracs Litig.*,
    777 F. Supp. 2d 1349 (J.P.M.L. 2011) ................................................... 19

*Watkins v. Nurture*, LLC,
    2:22-cv-00551 (E.D. La. Jan. 4, 2024) ............................................. 18, 20

*Whalen v. Monsanto Co.*,
    No. CV 19-9334, (E.D. La. Jan. 22, 2024) .............................................. 16

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
    644 F. Supp. 3d 1075 (S.D. Fla. 2022) ..................................................... 15

## Statutes

28 U.S.C. § 1407 .................................................................................... *passim*

28 U.S.C. § 1407(a) ......................................................................... 12, 17

## I.      INTRODUCTION

Almost three years ago, the Panel rejected centralizing this litigation, and nothing has changed that would support altering that decision.  The first centralization Motion came in the immediate wake of a high-profile February 2021 congressional subcommittee staff report claiming that commercial baby food contained allegedly unsafe levels of certain heavy metals like lead, arsenic, and mercury.  This Panel declined to centralize 86 related actions bringing largely economic class claims, instead noting that those claims can be handled as individual actions in each defendant's home court, which is exactly what transpired after the Panel's decision.

At that time, Movants' counsel here advocated against centralizing the then-pending personal injury lawsuits, pointing to the small number of filed cases and the fact that the "same constellation of counsel represent the parties, with two out of the three personal injury actions being represented by the same counsel."  The justification for refusing centralization of these personal injury baby food actions has only become stronger.

First, there is only a small number of pending federal cases, almost all of which were filed in the last few months as a prelude to this Motion.  Indeed, Movants' counsel promptly voluntarily dismissed the two cases they referenced in their 2021 response after this Panel denied centralization, and those cases were never litigated.  Even with the recent handful of filings, there are fewer than twenty total cases.  Notably, these newly-filed cases come almost *three* years after the nominal triggering event of this litigation—the February 2021 staff report.

Second, the same "constellation of counsel" has brought all of the currently filed federal court cases.  While the Motion (at 2) asserts that "[t]he 11 actions are filed by 10 different law firms," the truth is that these same firms have been working together across the small handful of cases that have been litigated in state and federal court over the past three years.  Perhaps this close

1

coordination is what led to the supposed "clerical error" that caused the original Motion to be brought on behalf of plaintiffs represented by all of these firms, including parties who then filed Interested Party Responses.  When the Panel clerk pointed out that parties cannot both be Movants and file Interested Party Responses (Dkt. 67), Movants' counsel claimed (Dkt. 68) that including certain plaintiffs among the complete list of Movants was a "clerical error," such that those same Movants now should be allowed instead to file Interested Party Response papers.  Setting aside this apparent gamesmanship to shroud the existing coordination among these counsel, there is no reason that such informal coordination cannot continue to occur.

Third, one of the principal benefits of centralization—coordination of company-side discovery—is unnecessary here because of the significant discovery that has occurred over the last three years.  Indeed, in a recent hearing in one of the pending state court cases, Movants' counsel boasted that "98%" of the necessary discovery of the company defendants is *done*.  Further, discovery has been shared across the existing cases, and it will be available for use in the newly-filed actions as well, should they actually proceed.

Fourth, in the ensuing nearly three years since this Panel's first denial, two actions have reached a merits determination.  In federal court, the first case (not prosecuted by Movants' counsel here) reached trial but, after hearing all of the plaintiffs' evidence, the  court granted the defendant a directed verdict on general causation because "such general causation is simply not supported by the science."   In the second case, in California state court, the trial judge excluded plaintiff's causation experts, leading to summary judgment for the seven defendants, and also granted summary judgment on the alternative ground that plaintiff had no evidence causally linking consumption of any individual defendant's baby foods to the minor plaintiff's alleged injury.  These two judicial results stand in sharp contrast to the misleading picture Movants hope to paint

(Mot. at 4-11)—that somehow baby foods are a recognized cause of autism with or without ADHD, and that consumption of one or more defendant's various baby food products can plausibly be linked to any individual child's autism and ADHD.

While the Panel should justifiably look skeptically at Movant's "make-your-own mass tort" approach, at bottom, none of the relevant factors the Panel considers when deciding whether to centralize actions weighs in favor of centralization. As the Panel emphasized when it rejected the first Motion in this litigation, and as it has stated many times, "centralization under Section 1407 should be the last solution after considered review of all other options." *In re Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1378 (J.P.M.L. 2011). The renewed Motion to centralize these actions should be denied.

## II.   PROCEDURAL HISTORY OF THE LITIGATION

The origins of this litigation began three years ago in the wake of a highly-publicized report by the staff of a congressional subcommittee, which featured test results showing certain heavy metals in some of defendants' commercial baby food products.[1] Despite the FDA publicly urging parents not to be alarmed and explaining that these metals in trace amounts are prevalent throughout our food supply,[2] the staff report triggered an immediate wave of lawsuits—almost exclusively economic class actions. There also were a handful of suits alleging personal injury among the initial tranche of suits, two of which were filed by Movants' counsel. At that time,

---

[1] Staff Report, *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (Feb. 4, 2021) https://oversightdemocrats.house.gov/sites/democrats.oversight. house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf.

[2] FDA, *FDA Shares Action Plan for Reducing Exposure to Toxic Elements from Foods for Babies and Young Children,* https://www.fda.gov/food/cfsan-constituent-updates/fda-shares-action-plan-reducing-exposure-toxic-elements-foods-babies-and-youngchildren ("You do not need to throw out packaged baby foods or stop feeding certain foods to your babies and children. Eliminating entire food groups from your children's diet may result in nutrient deficiencies and potential poor health outcomes. A varied diet is best.") (last accessed Feb. 13, 2024).

Movants' counsel advocated *against* centralization, citing the small number of such actions and the ability to coordinate those cases informally.  *See* Interested Party Response of Baum, Hedlund, Aristei & Goldman, P.C. (now Wisner Baum, LLP), MDL 2997, ECF No. 121 at 1 (Apr. 13, 2021) (pointing out that the "same constellation of counsel represent the parties, with two out of the three personal injury actions being represented by the same counsel").  Ultimately, the Panel declined to centralize the litigation, leaving the class cases against the individual defendants to be severed, transferred, and consolidated in each defendant's home forum, which has largely occurred.  The two personal injury cases brought by Movants' counsel were soon thereafter voluntarily dismissed, and the cases were never litigated.

In the ensuing nearly three years, there has been a smattering of personal injury cases litigated in various state and federal courts, two of which have reached merits determinations in favor of defendants.  In a federal lawsuit prosecuted in the Southern District of Texas, the case proceeded to a jury trial in February 2023.  After allowing plaintiffs to present their full causation case, the trial judge granted a directed verdict for the manufacturer for the failure to prove general causation, noting in his decision that "such general causation is simply not supported by the science."  Declaration of Livia M. Kiser ("Kiser Declaration"), Exhibit ("Ex.") 1, Trial Tr., *Palmquist et al. v. The Hain Celestial Group, Inc., et al.* (S.D. Tex. Feb. 17, 2023), at 44:7-10, appeal pending, No. 23-40197 (5th Cir.).

The second case to reach a merits ruling was *NC v. Hain, et al*., a case which Movant's counsel brought in Los Angeles County Superior Court against seven different baby food providers.  In *NC*, Movants' counsel worked with a consortium of lawyers at other law firms to conduct significant discovery across all seven of the defendants.  Those cooperating firms— including Beasley Allen; Walsh Law; Claggett & Sykes; Morris, Sullivan & Lemkul; Brady Law;

and Wagstaff Law Firm—were admitted *pro hac vice* in the *NC* case while also joining together to prosecute similar cases in a Louisiana federal court and Nevada, Florida and Hawaii state courts. Indeed, on February 2, 2024, all of these lawyers submitted a consolidated filing as associated counsel in the pending California state court actions. *See* Kiser Declaration, Ex. 2.

In August 2023, the *NC* court excluded plaintiff's key causation experts because they offered unreliable opinions, resulting in summary judgment for defendants and also granted summary judgment on the alternative basis that plaintiff failed to identify which foods from each individual defendant allegedly caused plaintiff's injuries. *See* Kiser Declaration, Ex. 3, Transcript, *NC v. Hain Celestial Group, et al.* (L.A. Super. Ct. Aug. 24, 2023), at 4-28; Ex. 4, Aug. 24, 2023 Minute Order; Ex. 5, Sept. 1, 2023 Order Granting Defendants Motion for Summary Judgment. In seeking to avoid costs, Movants' counsel emphasized that the broad scope of general discovery conducted that could be used in any future cases:

- "Future cases will inevitably benefit from the substantial common discovery conducted in this case, including numerous company and expert depositions."

- "All of these company depositions are germane to general liability and will thus be re-used in future baby food cases pending before this Court."

Kiser Declaration, Ex. 6, Plaintiff's Motion to Tax/Strike Costs, *NC v. Hain Celestial Group, Inc, et al.* (L.A. Super. Ct. Jan. 9, 2024), at 1, 4; *see also* Ex. 7, Joint Status Report, *Pourdanesh et al. v. Hain Celestial Group, Inc.,* No. 23stcv03484 (L.A. Super. Ct. Jan. 30, 2024) at 2 (highlighting "substantial number of company and third-party depositions, general causation discovery" conducted in *NC*). And at the recent status conference to consider an expedited trial, Movants' counsel declared that "98%" of the defendant discovery necessary for a future trial is complete. *See* Kiser Declaration, Ex. 8, Transcript, *Pourdanesh et al. v. Hain Celestial Group, Inc.*, No.

23stcv03484 (L.A. Super. Ct. Feb 6, 2024) at 13.[3]

In tandem with their press for a trial in California state court, Movants' counsel also coordinated with their co-counsel to file nine new federal actions—a litigation where the triggering event took place over three years ago and, until recently, only two federal cases were pending. Shortly thereafter, they brought the current centralization Motion. While the Motion proclaims that "[t]he 11 actions are filed by 10 different law firms, in 7 different federal district courts," (Mot .at 2) in truth, all these lawsuits have been filed by the same group of firms that has already been closely cooperating across the *NC* and related pending cases for the past several years. *See* Kiser Declaration, Ex. 9, Chart of Pending Cases in State and Federal Court.

## III.   BABY FOOD, HEAVY METALS, AND THE SCIENCE OF ASD

Movants' claims rest on an entirely novel scientific theory found nowhere in the medical literature: one of the most common neurodevelopmental disorders among American children— autism spectrum disorder (autism or ASD),[4] often co-presenting with Attention Deficit Hyperactivity Disorder (ADHD)[5]—is *caused* by eating commercial baby food. Plaintiffs do not

---

[3] Defendants will file the final transcript when it becomes available, anticipated within 48 hours.

[4] The essential features of ASD are persistent impairment in reciprocal social communication and social interaction and restricted, repetitive patterns of behavior, interests, or activities. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., Text Revision, 2022) ("DSM") at 60. Estimates of prevalence range from about 1% to 2% of children in the United States, and a little under 1% globally. *Id*. at 62-63. The American Academy of Pediatrics currently recommends ASD screening for all children at 18 and 24 months, although research has demonstrated that certain behavioral differences, such as in eye tracking, can be observed in children well prior to their ASD diagnosis—even before six months. *See* https://www.cdc.gov/ncbddd/autism/hcp-screening.html;   https://www.nih.gov/news-events/news-releases/earliest-marker-autism-found-young-infants.

[5] ADHD is characterized by a persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development. *See* DSM, at 70. ADHD is highly prevalent in children with ASD. Because inattention in very young children is often developmentally normal, however, ADHD may well be diagnosed years after the initial ASD diagnosis. *Id*. at 70.

claim that any defect in defendants' manufacturing processes or packaging causes this alleged hazard.  Rather, they allege that the harm comes directly from the healthful ingredients that baby foods contain.  In short, Plaintiffs' case boils down to the following syllogism:

1.  Baby foods contain heavy metals (*i.e.*, lead, arsenic, and/or mercury) because they are made from vegetables, fruits, and grains which absorb heavy metals from the soil, water, and air in which they are grown;

2.  Heavy metals are "neurotoxins" and there is no known "safe" level of heavy metals;

3.  Baby foods, thus, are neurotoxic;

4.  ASD is a neurologic condition that *may* be tied to neurotoxic exposures;

5.  *Ergo,* baby foods "cause" ASD.

The analytical gaps, leaps of logic, circular reasoning, and simple absence of common sense that pervade Plaintiffs' science case have already been exposed and debunked in the two lawsuits litigated to resolution.[6]

First, heavy metals, including lead, arsenic, and mercury, are ubiquitous in our environment (including because planet Earth is made from them) and all humans are exposed to them from a wide range of sources.  This exposure starts even before birth and continues in early infancy, as metals to which mom is exposed from any number of sources pass through the placenta to her baby.  They also are carried in breast milk.  Environmental exposure to metals does not suddenly begin or become relevant to neurodevelopment only when children reach the age of eating commercial baby food.

Second, heavy metals are a food supply issue, not a *baby* food issue.  Fruits, vegetables,

---

[6] A remarkably similar syllogism drove baseless fears (not to mention years of litigation) related to childhood vaccines, which were alleged to cause ASD because they were made with small amounts of the mercury-containing preservative thimerosal.  While any claim of vaccines causing ASD has been thoroughly debunked, it still causes significant public health concerns by driving vaccine hesitancy. https://www.cdc.gov/vaccinesafety/concerns/autism.html.

and grains may contain trace[7] levels of heavy metals because plants absorb them from the soil, water, and air in which they grow.  As a result, it is well accepted that parents cannot shop their way around the presence of heavy metals by buying or growing their own raw ingredients and/or otherwise making their own baby food, and even some of the consumer groups that Movants praise for trumpeting the issue of heavy metals in commercial baby food have demonstrated with their own testing that homemade baby food does not have lower levels of these metals than commercial baby food.    HBBF, *Is Homemade Baby Food Better?* (Aug. 2022) at 1, https://hbbf.org/sites/default/files/2023-03/BabyFoodReport2022_R11_Web.pdf ("**We found no evidence to suggest that homemade baby food has lower heavy metal levels than store-bought brands.**  Heavy metals levels varied widely by **food type**, not by who made the food.") (bold in original).

    Third, commercially prepared baby foods have fed the vast majority of American children for over 100 years.[8] But, over the last several decades, metals levels in food consumed by infants

---

[7] Trace means in the parts per billion ("ppb") range, the equivalent of one drop of water in a swimming pool.  Center for Hazardous Substance Research, *Understanding Units of Measurement* (Oct. 2006), https://cfpub.epa.gov/ncer_abstracts/index.cfm/fuseaction/display.files/fileid/14285#:~:text=A%20way%20to%20visualize%20one,water%20in%20a%20swimming%20pool.&text=ABOUT%20THE%20AUTHOR%20Terrie%20K.  Until recently, testing equipment was not sufficiently sensitive to even detect metals at such low levels. *See* FDA, *What FDA is Doing to Protect Consumers from Toxic Metals in Foods*, https://www.fda.gov/food/conversations-experts-food-topics/what-fda-doing-protect-consumers-toxic-metals-foods (last accessed Feb. 13, 2024) ("We develop better methods for detecting these metals, so we can detect them at much lower levels in foods than we could before.").

[8] Data from FDA and elsewhere show that, while most children's diets at some point include commercially prepared baby foods, after a year the consumption of these foods drops precipitously.  From ages one to three, commercial baby food amounts to as little as 3.3 percent of the total diet with ever increasing amounts of widely available table foods making up the majority of what children eat. *See* Nov. 18, 2021 Transcript at 25-26, found at https://www.fda.gov/food/workshops-meetings-webinars-food-and-dietary-supplements/closer-zero-action-plan-impacts-toxic-element-exposure-and-nutrition-different-crucial-developmental.

and young children—including commercial baby food—have declined dramatically:[9]



At the same time, rates of ASD have dramatically increased:[10]



Not surprisingly, therefore, neither FDA nor any other public health authority[11] has ever claimed

that commercial baby foods are "unsafe" for consumption or have any causal relationship to the

development of ASD or ADHD.  On the other hand, FDA and the American Academy of Pediatrics

---

[9] FDA, *Trends in Exposure to Toxic Elements from Foods for Babies & Young Children*, https://www.fda.gov/media/147324/download (last accessed Feb. 13, 2024).

[10] CDC, *Data & Statistics on Autism Spectrum Disorder*, https://www.cdc.gov/ncbddd/autism/data.html (last accessed Feb. 13, 2024); Safe Minds, *CDC Reports: 1 in 44 American Children Have Autism*, https://safeminds.org/news/cdc-reports-1-in-44-american-children-have-autism/ (last accessed Feb. 13, 2024).

[11] Beyond FDA, plaintiffs' litigation position has never been endorsed by the American Psychiatric Association, the American Academy of Pediatrics ("AAP"), or the United States Department of Agriculture.

repeatedly have cautioned the public about unintended harms to children by avoiding nutritionally dense foods needed for healthy development (including brain development).[12]

Fourth, despite more than three years of litigation, Plaintiffs do not have a single scientific study that links eating baby food—or any ingredient contained in baby food—with ASD or co-occurring ADHD.  Nor do they have any *bona fide* experts thus far who have been willing to put their professional reputations on the line and opine that commercial baby food is, *in fact,* a scientifically accepted cause of ASD.  In the pending cases over the last three years, Plaintiffs have proffered epidemiologists and toxicologists willing to say that heavy metals at some unidentified dose and duration of exposure, during some non-specific developmental time period (which may include prenatal exposure), through some unidentified media (which may include anything from highly contaminated water to old housing to living near an industrial site), *may* be a cause of ASD.  And they have proffered medical experts willing to say that, *assuming metals cause ASD,* baby food *could* cause ASD in a particular child if the dose were adequate.  But they have identified no expert able or willing to put their case together, including by explaining what particular healthy fruits, vegetables, or grains could cause ASD, what would be a causative dose/amount of such food, how a child could eat enough of that food on a sufficiently regular basis to be causative, or whether  (recognizing that all children must eat food) the risk would be any different if the child

---

[12] *See e.g.*, FDA, *Closer to Zero: Reducing Childhood Exposure to Contaminants from Foods*, https://www.fda.gov/food/environmental-contaminants-food/closer-zero-reducing-childhood-exposure-contaminants-foods (last updated February 5, 2024) ("It is crucial to ensure that measures taken to limit arsenic, lead, cadmium, and mercury in foods do not have unintended consequences—like eliminating from the marketplace foods that have significant nutritional benefits . . . ."); AAP, *Babies Should Eat a Varied Diet to Protect Against Heavy Metals* in Commercial, Homemade Food (Aug. 11, 2022), https://publications.aap.org/aapnews/news/21916/AAP-Babies-should-eat-a-varied-diet-to-protect.

ingested comparable fruits, vegetables, and grains from the grocery store.[13]

Last, and perhaps most importantly, it is widely agreed that exactly why and how ASD occurs still remains mostly a scientific puzzle, except that it is accepted science that ASD is among the most heritable of all health conditions. While ASD researchers recognize the potential for some "environmental" factors to affect ASD risk (by which they mean factors other than genetics), as potentially playing a role in some cases of ASD, very few environmental links have been established. Moreover, all of the known non-genetic/"environmental" factors—including older parental (particularly paternal) age, maternal infection during pregnancy, and the maternal use of valproic acid (an anti-epileptic)—require prenatal exposure. Plaintiffs have failed to identify any authoritative body or research finding that any population of children not otherwise destined to express ASD from birth go on to "acquire" ASD because of something they experience in their environments months or even years after birth—*i.e.*, the time period when children eat commercial baby food (and table food). This lack of science and entirely circular nature of Plaintiffs' science case was laid bare in *NC*, where the court ruled that the plaintiff's experts could not make a reliable connection between the ingestion of commercial baby food and plaintiff's ASD. *See* Kiser Declaration, Ex. 3, at 27-28 ("[I]n order to properly rule in, in using the differential etiology methodology that they purport to use, [plaintiff's experts] needed to do a general causation analysis of the correct material at issue here, namely, the defendants' baby food products, a complex

---

[13] The potentially significant adverse public health concerns from alarming parents about feeding children healthy foods (particularly at this time of epidemic rates of childhood obesity and related diseases) are more than self-evident. Similarly, the negative public health ramifications of unsubstantiated ASD fears were also noted in the recently dismissed MDL asserting that Tylenol (acetaminophen) taken during pregnancy can lead to autism. While plaintiffs had no reliable science to support their claims, there was real science that denying or making pregnant women afraid of using Tylenol to treat maternal infection and fever could cause them and their babies real harm. Indeed, untreated maternal fever is one potential risk for autism itself. *See generally*, *In re Acetaminophen – ASD-ADHD Prods. Liab. Litig.*, 1:22md3043, ECF No. 1381 at 11, 20 (S.D.N.Y Dec. 18, 2023).

mixture.  And, without such an analysis, the court finds that they could not properly rule in those products for the front end of their differential etiology opinion.").

## IV.    THE MOTION FOR CENTRALIZATION SHOULD BE DENIED

### A.    Legal Standard

This Panel may centralize two or more civil cases for coordinated pretrial proceedings when (i) transfer "will promote the just and efficient conduct of such actions," (ii) the cases "involv[e] one or more common questions of fact," and (iii) transfer will further "the convenience of parties and witnesses."  28 U.S.C. § 1407(a).  The party seeking centralization bears the burden of showing Section 1407's requirements have been met.  *In re Cable Tie Patent Litig.*, 487 F. Supp. 1351, 1354 (J.P.M.L. 1980).  Moreover, "centralization under Section 1407 should be the last solution after considered review of all other options."  *In re Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d at 1378.

### B.    Centralization Will Not Promote the Just and Efficient Conduct of this Litigation.

The Panel considers a number of factors when deciding whether centralization will meet Section 1407's statutory goal of promoting the just and efficient conduct of the actions, including the number of constituent actions, the range of involved counsel, the feasibility of coordinating the actions informally, and the progress of discovery already accomplished.  Although these actions indisputably involve one or more core questions of fact (as the Panel previously noted), all of the other factors animating whether centralization is necessary for the efficient administration of these cases weigh in favor of denying the Motion.

<u>First</u>, there are currently a very small number of federal actions—fewer than 20, and all filed by the same tight-knit set of counsel.  Of those, only two cases pre-dated the immediate run up to the current Motion.  In that respect, this matter is indistinguishable from the *Cymbalta*

litigation, where that movant (coincidentally represented by the same Movants' counsel here) filed a slew of cases immediately before bringing a motion to centralize, which the Panel denied. *See In re Cymbalta (Duloxetine) Prods. Liab. Litig.*, MDL No 2576, ECF. No. 40 at 1 (Dec. 10, 2014) ("The three earliest-filed cases were commenced between April and June 2013, and the other 22 actions were commenced in August 2014.").

Second, as noted, these actions have all been brought by the same, closely coordinated set of Plaintiffs' counsel, and all of the Defendants are represented by the same counsel in all of the cases. Indeed, all the pending personal injury cases in both federal and state court are all controlled by the same small set of counsel. *See* Kiser Declaration, Ex. 9. In such circumstances, informal coordination without centralization is eminently feasible. Indeed, as detailed above, that informal coordination has already been occurring for the past several years. *See, e.g., In re Cymbalta*, ECF No. 40, at 2 ("[O]nly a limited number of plaintiffs' counsel are involved in these cases."); *In re Covidien Hernia Mesh Prods. Liab. Litig.*, MDL 2953, ECF No. 38 at 3 (Aug. 7, 2020) ("The presence of common counsel here should facilitate informal coordination of this relatively small number of actions.")

Third, and closely related, the principal need for coordination in this type of litigation is to conduct company-side (*i.e.*, Defendants) common discovery, including document production and company employee depositions. In this case, Movants' counsel was ready to go to trial in *NC* against all of the Defendants with the discovery they had prior to the case being dismissed on expert and summary judgment grounds. Also, as Movants' counsel recently told the California state court, company discovery is "98%" done. *See* Ex. 8, at 13.; *see also* Ex. 6, at 1 ("Future cases will inevitably benefit from the substantial common discovery conducted in this case, including numerous company and expert depositions."). Because that common discovery has already largely

been completed, and there is an agreement to utilize that discovery in future cases (as Defendants pledge here), the need for a coordinated proceeding is greatly diminished. *See, e.g., In re Cymbalta*, ECF No. 40 at 2 ("[T]he record shows that most, if not all, of the common discovery has already taken place in those earlier-filed actions.").[14]

In arguing that such informal coordination is "Impractical," Movants' Motion reads as if none of this work has already been done. *See, e.g.*, Mot. at 16-17 ("As is common in an MDL proceeding, Plaintiffs anticipate taking the depositions of treating physicians, third-party witnesses, and current and former employees of Defendants, many of whom will be deposed in multiple cases or will discuss overlapping issues. It would be very difficult to informally coordinate the timing and scope of this discovery across numerous cases in different stages of litigation."); *id.* at 3 ("Each Baby Food case requires extensive discovery concerning the safety, development, and marketing of Baby Foods.").  Movants seemed to have simply plucked-out boilerplate verbiage from some prior MDL petition untethered to the actual circumstances of this litigation, which does not meet their burden to show that Section 1407's requirements are satisfied here.

Movants' assertion (Mot. at 2-3, 11-12) that prior efforts to address heavy metals somehow justifies coordination so far into this litigation makes no logical sense.  To be sure, several Defendants participated in the Baby Food Council, a public-private partnership bringing together manufacturers, FDA, academics at Cornell University, and consumer groups focused on efforts to reduce levels of heavy metals in baby food.  And it is also true that there can sometimes be co-

---

[14] It bears mention that in the wake of this Panel's refusal to centralize the *Cymbalta* litigation on two separate occasions, in the face of nearly identical assertions by Movants' counsel of having "thousands" of prospective plaintiffs, not a single additional federal case was filed, and the litigation resolved shortly after the defendant tried three cases in federal courts in California and Virginia, all to defense verdicts.

manufacturing arrangements in the industry.  But neither fact distinguishes the baby food industry from any other industry or otherwise changes the centralization calculus, especially because Movants articulate no theory as to how these efforts require some different approach on pretrial discovery or litigation of the cases more broadly (particularly where, as here, Movants acknowledge that "98%" of the discovery of Defendants is done).  However fanciful this theory, it certainly does not require an MDL to explore.

The one legitimate question to consider is whether an MDL is needed to address the central issue of general causation.  As set forth above, there is no reliable science to support Plaintiffs' overarching theory that ingestion of commercial baby food can cause ASD with or without ADHD. There are no studies in the scientific literature of autism that implicate baby food, let alone any brand(s) or type(s) of baby food.  There are not even studies of ASD that involve any one or more fruits, vegetables, or grains used to formulate any brand(s) or type(s) of commercial baby food products.  (This perhaps is not surprising given the products at issue here are fundamentally different from a pharmaceutical or chemical because nutrient-dense foods are essential for human growth and development, and the very nutrients present in the foods can prevent uptake of the allegedly toxic metals they naturally contain).  However, Plaintiffs point to no specific product or products in these product liability cases.  Plaintiffs instead assert claims based upon trace levels of three different allegedly toxic metals that may (or may not) be found to varying, minute degrees in dozens (if not hundreds) of different formulations of seven different companies' unique baby food products.  Even in cases (unlike here) brought against one readily identifiable product (like Zantac or Roundup), the law requires the general causation focus to be on the product, not any alleged contaminant.  *See*, *e.g.*, *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1192 (S.D. Fla. 2022) ("As the Court explained in its section framing the general causation

question … the product at issue in this MDL is ranitidine, not NDMA"); Kiser Declaration, Ex. 10, *Whalen v. Monsanto Co*., No. 2:19cv9334, at 9 (E.D. La. Jan. 22, 2024), at 9 (E.D. La. Jan. 22, 2024) ("[I]n concluding that chronic exposure to arsenic—and therefore  Roundup—causes squamous cell carcinoma, [plaintiff's expert] relies solely upon arsenic-specific literature. Roundup, however, is the relevant product in this case.").  Given the close coordination with counsel that has already been occurring in these cases for years, it will certainly be feasible to coordinate any general causation expert depositions and Rule 702 briefing and hearings across the federal cases.[15]  In sum, there is little to be gained via a centralized proceeding to address the general causation question, and there is no reason for the Panel to revisit its prior decision to not centralize these cases.  *See In re Cymbalta (Duloxetine) Prods. Liab. Litig.*, MDL No. 2576, ECF No. 40 at 2.

## V.     THE SOUTHERN DISTRICT OF NEW YORK WOULD BE AN APPROPRIATE FORUM IF THE PANEL DECIDES TO CENTRALIZE THE LITIGATION

As set forth above, centralization under Section 1407 is neither appropriate nor warranted. However, if the Panel were inclined to centralize these cases, the Southern District of New York would be the appropriate forum.  Defendants—and consequently, the relevant evidence and witnesses—are largely located in the New York area or the eastern United States, at a convenient

---

[15] Beyond the fatal general causation problem tied to Movants' legally deficient product liability theory of the case discussed above, Movants have not set forth any science or other scientifically valid method for identifying at a population level the dose, duration, and timing of exposure needed for "baby food autism" or how to distinguish "baby food autism" from all other autism generally. Nor could an MDL possibly aid the parties with the mountain of case-specific discovery issues – particularly given the myriad of genetic and familial variables in play in these cases.  It is thus no wonder that the specific causation experts who Movants' counsel have proffered thus far devolve into entirely circular reasoning when pushed to explain how one can reliably determine it was baby food that caused a specific child's ASD.  *See* Kiser Declaration, Ex. 3, at 27-28 (rejecting causation experts' circular reasoning when they did not "do a general causation analysis of the correct material at issue here" and thus "could not properly rule in those products for the front end of their differential etiology opinion.").

distance from New York City, and the jurists in the Southern District of New York will bring considerable experience in product liability MDLs to these cases, which involve complex scientific, medical, and causation issues.

An appropriate transferee district is the one that will best serve "the convenience of the parties and witnesses" and promote the "just and efficient conduct" of the proceedings.  28 U.S.C. § 1407(a); *In re AOL Time Warner, Inc.*, 235 F. Supp. 2d 1380, 1381 (J.P.M.L. 2002).   In determining the appropriate transferee district, the Panel considers the "litigation's center of gravity."  *See In re Nine West LBO Secs. Litig.*, 464 F. Supp. 3d 1383, 1385 (J.P.M.L. 2020). Factors considered in this analysis include (among others) the location of the parties, witnesses, and documents; the convenience of the parties and witnesses; and the resources and experience of the transferee forum.  *See In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 249 F. Supp. 3d 1357, 1360 (J.P.M.L. 2017).  All of these factors weigh in favor of selecting the Southern District of New York as the transferee forum.

**Location of the Parties, Witnesses, and Documents**. Only a relatively small number of cases have been filed to date, and of those cases, no one court can be considered the "center of gravity."  Plaintiffs' counsel selectively filed the majority of these cases in courts located in the western half of the United States, but given the defendants involved, the center of the litigation is in the east.  The Panel often selects a transferee forum where one or more of the defendants is headquartered.  *See, e.g., In re Neurografix ('360) Patent Litigation*, 936 F. Supp. 2d 1376, 1377-78 (J.P.M.L. 2013) (centralizing actions in the District of Massachusetts because, *inter alia*, one of multiple defendants was located in Massachusetts); *In re Farxiga (Dapagliflozin) Prods. Liab. Litig.,* 273 F. Supp. 3d 1380, 1382 (J.P.M.L. 2017) (centralizing related actions in the Southern District of New York because the defendant "is headquartered in New York, and thus many

17

witnesses and relevant documents are likely to be found in or near the district"); *In re Procter & Gamble Aerosol Prods. Mktg. & Sales Pracs. Litig.*, 600 F. Supp. 3d 1343, 1344 (J.P.M.L. 2022) (centralizing related actions where "P&G has its headquarters" because "common witnesses and other evidence likely will be located in or near this district").

Two Defendants (Beech-Nut and Nurture) maintain headquarters in New York, and Hain recently moved its headquarters across the Hudson River to Hoboken, New Jersey, meaning that (for any remaining discovery to be done, if any) several witnesses and relevant documents are located in or near the Southern District of New York.  Two additional Defendants, manufacturer Sprout and Plum's former parent Campbell Soup Company (although not properly named as a defendant) are also located in New Jersey, and Defendant Gerber is located in Northern Virginia, near Washington D.C.  The only manufacturer outside the central east coast is Plum, which recently located in California from New Jersey; Walmart, which does not independently manufacture baby food, is based in Arkansas.[16]

**The Convenience of the Parties and Witnesses.**  New York City is centrally located to all Defendants and their witnesses.  With five Defendants located in New York or New Jersey, and two other Defendants located in the eastern part of the United States, travel will be convenient for the majority of the parties.  While the individual Plaintiffs reside throughout the United States, New York City is convenient for most parties and counsel due to the accessibility of flights, hotels,

---

[16] The schedule of actions identifies four additional defendants.  Two, Danone S.A. and Nestle S.A., are foreign entities located in France and Switzerland with no presence in the U.S.  No Plaintiff has served either company.  Nor has either company appeared in any constituent action. The remaining two entities, retailers Amazon and Whole Foods, are named defendants in one case, *Watkins v. Nurture, LLC*, 2:22-cv-00551, and thus the Panel can give minimal weight to the locations of these defendants—neither of which is located within a jurisdiction proposed by Movants and both of which are in a case Movants do not seek to centralize.

and public transportation.[17]

**Resources and Experience of the Transferee Forum**.  The Southern District of New York is also a suitable forum because of its extensive experience handling MDLs, and particularly product liability MDLs.  A district is an "appropriate transferee district 'if it' has a great deal of experience serving as a transferee court yet has a manageable MDL docket."  *In re Sprint Premium Data Plan Mktg. & Sales Pracs. Litig.,* 777 F. Supp. 2d 1349, 1351 (J.P.M.L. 2011).  The Southern District of New York has many experienced jurists who have adeptly managed product liability MDLs, including at least one MDL involving causes of autism.  *In re Acetaminophen – ASD/ADHD Prods. Liab. Litig.*, MDL 3043 (Hon. Denise L. Cote); *In re Eliquis (Apixaban) Prods. Liab. Litig.*, MDL No. 2754 (Hon. Denise L. Cote); *In re Mirena IUD Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, MDL 2767 (Hon. Paul A. Engelmayer); *In re General Motors LLC Ignition Switch Litig.*, MDL 2543 (Hon. Jesse M. Furman); *In re Farxiga (Dapagliflozin) Prods. Liab. Litig.*, MDL 2776 (Hon. Lorna G. Schofield); *In re Mirena IUD Prods. Liab. Litig. (No. I)*, MDL 2434 (Hon. Cathy Seibel).  The Southern District of New York, which has terminated five MDLs in the last year alone and has issued an MDL-terminating order in a sixth MDL, has the time and capacity to manage this MDL.  United States Judicial Panel on Multidistrict Litigation, *Multidistrict Litigations Terminated Through September 30, 2023*, *available at* https://www.jpml.uscourts.gov/sites/jpml/files/JPML_Fiscal_Year_2023_ Terminated_Litigations_Report_0.pdf; *In re Acetaminophen – ASD-ADHD Prods. Liab. Litig.*,

---

[17] Several of the Interested Party Responses of the coordinated counsel, to the extent the Panel entertains them, suggest assignment to a particular judge in the Western District of Missouri where one recently-filed case against only some of the Defendants is pending.  Setting aside the fact that the proposed judge already has two MDLs and that there has been no activity in the case to date that might suggest some special experience in the litigation, that District would not be convenient to the East Coast-based parties.

1:22md3043, ECF No. 1381, Opinion and Order (Dec. 18, 2023).[18]

Movants propose four jurisdictions as appropriate MDL venues: District of Nevada, Northern District of California, Central District of California, and Eastern District of Louisiana.[19] Apart from the *Watkins* matter, all of these cases were filed in the last few months as a prelude to this Motion and are still in the nascent stages, and their location signals nothing more than where the coordinating plaintiffs' counsel behind this Motion hope to dictate the location of any centralized proceeding. More substantively, none of these jurisdictions bears any geographically proximity to any Defendant or the evidence and witnesses involved in these cases.

The Southern District of New York, which has vast experience with product liability MDLs and is centrally located near the vast majority of the parties and evidence, would be the most appropriate forum if the Panel elects to centralize these cases.

## VI.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Panel deny Movants' Motion for Transfer, or in the alternative, centralize these cases in the the Southern District of New York.

---

[18] The fact that Plaintiffs have not filed a constituent action in New York is not dispositive. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391, 1396 (J.P.M.L. 2018) (transferring cases to Judge Richard M. Gergel in the District of South Carolina, holding that "[t]hough a related action is not currently pending in the District of South Carolina, that is not a bar to centralization in a particular district) (citing *In re Bard IVC Filters Prods. Liab. Litig.*, 122 F. Supp. 3d 1375, 1376-77 (J.P.M.L. 2015) (centralizing actions in District of Arizona, where no action was pending)).

[19] Movants identify Judge Papillion as having the first-filed federal baby food personal injury action. In fact, the first-filed action was *Palmquist v. Hain Celestial Group* in the Southern District of Texas, No. 3:21-cv-90 (filed Apr. 9, 2021). The court dismissed *Palmquist* following a directed verdict in Defendant's favor and therefore Movants do not include that case in this Motion.

Dated: February 13, 2024

Respectfully submitted,

By: */s/ Livia M. Kiser*
Livia M. Kiser
**KING & SPALDING, LLP**
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Telephone: (312) 764-6911
Facsimile: (312) 995-6330
Email: lkiser@kslaw.com

*Counsel for Beech-Nut Nutrition Company*

By: */s/ Michael L. Resch*
Michael L. Resch
**KING & SPALDING LLP**
50 California St # 3300
San Francisco, CA 94111
Telephone: (415) 318-1230
Facsimile: (415) 318-1300
Email: mresch@kslaw.com

*Counsel for Walmart Inc.*

By: */s/ Michael X. Imbroscio*
Michael X. Imbroscio
**COVINGTON & BURLING, LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-5694
Facsimile: (202) 778-5694
Email:mimbroscio@cov.com

*Counsel for The Hain Celestial Group, Inc.*

By: */s/ Hope S. Freiwald*
Hope S. Freiwald
**DECHERT LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994-2514
Facsimile: (215) 665-2514
Email: hope.freiwald@dechert.com

*Counsel for Plum, PBC*

21

By: */s/ Peter M. Ryan*
Peter M. Ryan
**COZEN O'CONNOR**
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: (215) 665-2130
Facsimile: (215) 701-2157
Email: pryan@cozen.com

*Counsel for Campbell Soup Company*

By: */s/ Bryan A. Merryman*
Bryan A. Merryman
**WHITE & CASE LLP**
555 S. Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone:  (213) 620-7700
Facsimile:  (213) 452-2329
Email:  bmerryman@whitecase.com

*Counsel for Gerber Products Company*

By: */s/ Nancy Erfle*
Nancy Erfle
**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Phone: (503) 382-3852
Fax: (503) 616-3600
Email: nerfle@grsm.com

*Counsel for Sprout Foods, Inc.*